# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 3, 2011 Session

## DENNIS W. BLACKMON, ET AL. V. LP PIGEON FORGE, LLC, ET AL.

**Appeal from the Circuit Court for Sevier County**
**No. 2009-0258-III      Rex Henry Ogle, Judge**

_____

**No. E2010-01359-COA-R3-CV-FILED-AUGUST 25, 2011**

_____

This is a nursing home negligence case involving an arbitration agreement. The son of the decedent signed documents admitting his mother to the defendant nursing home. The admission documents included an arbitration agreement. After his mother's death, the son filed a lawsuit on behalf of her estate against the defendant nursing home and others connected to its administration. The defendants filed a motion to compel arbitration pursuant to the agreement signed by the son. The trial court denied the motion, finding that the son was not the decedent's agent and did not have authority to sign on her behalf. The defendants appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Rebecca Adelman and Peter B. Winterburn, Memphis, Tennessee, for the appellants, LP Pigeon Forge, LLC; Signature Consulting Services, LLC; Signature Clinical Consulting Services, LLC; Signature Healthcare, LLC; Jonathan Jack Bowers; Integritas Health Care, LLC; Integritas LTC Practitioners of Tennessee, LLC; Integritas Professional Development Services, LLC; Integritas of Tennessee, LLC; and Kathleen A. Arnold.

Kenneth L. Connor and Camille Godwin, Leesburg, Virginia, and Marty McDonald, Knoxville, Tennessee, for the appellee, Dennis W. Blackmon, Individually and as Personal Representative of the Estate of Lois L. Pierce.

## OPINION

## I. BACKGROUND

Before the decedent, Lois Pierce ("Mother"), was hospitalized on April 7, 2008, the 78-year-old widow had lived alone in her home in Sevierville, Tennessee, for over a decade. During that time, she handled all of her own affairs. She prepared her own meals, transported herself wherever she wanted to go, kept her own checkbook, and handled all of her finances without any assistance.

Mother made the decision to admit herself to Fort Sanders Sevier Medical Center for the care of small sores in her perineal area and adjacent buttock. During her three-day hospitalization, the record reveals that she intelligently interacted with family members and hospital staff. She continued to make her own decisions throughout this hospital stay and, according to the hospital records, was alert and oriented when she left the hospital for the Pigeon Forge Care and Rehabilitation Center ("Facility") on April 10, 2008. Facility is operated by LP Pigeon Forge, LLC (the licensed operator of Facility); Signature Consulting Services, LLC; Signature Clinical Consulting Services, LLC; Signature Healthcare, LLC; Jonathan Jack Bowers; Integritas Health Care, LLC; Integritas LTC Practitioners of Tennessee, LLC; Integritas Professional Development Services, LLC; Integritas of Tennessee, LLC; and Kathleen A. Arnold (collectively "Defendants").

Mother's stay at Facility was expected to be of short duration. It lasted for approximately 20 days. According to the complaint filed in this action by Dennis W. Blackmon ("Son"), acting individually and as the personal representative of Mother's estate, issues arose regarding Mother's declining condition and alleged lack of adequate care. It is alleged that when Mother was removed from Facility and taken to the emergency room, she was found to be suffering from massive infected Stage IV pressure sores. On May 7, 2008, she died when her organs failed as a result of the infections.

In response to the complaint, Defendants filed a motion to compel arbitration. They relied upon an arbitration agreement signed by Son when Mother was admitted to Facility.

Although Mother was fully capable of making her own decisions on admission to Facility, Defendants did not afford her the opportunity. Son, a local minister, maintains that upon his initial arrival at Facility, he was told that before he could locate and visit his mother, he needed to first speak with Donna Buck, the Social Services Director. According to Son, despite the fact that he made no representation to Ms. Buck about any authority to act on behalf of his mother, she took him to her office to sign documents which she represented were necessary for Medicare to start paying Facility rather than the hospital. Ms. Buck then

proceeded to flip through the pages of the admission documents, placing an "x" beside the blanks she wanted him to sign. Anxious to get to his mother's room and relying on the representations of Ms. Buck, Son felt no need to read the materials and signed where Ms. Buck indicated. Son testified that no further explanation was offered to him, and he did not feel he needed to ask questions in light of the representations made and his understanding that Ms. Buck was a "social worker."

Son testified that he was not provided with copies of any of the documents he signed. His meeting with Ms. Buck lasted about thirty minutes. Unbeknownst to him at the time, among the documents he signed was an agreement waiving Mother's right to a jury trial and agreeing to arbitration in the event of any dispute arising out of her care and treatment in Facility.

Defendants argue that Ms. Buck did not meet with Son to sign the admission documents at issue in this matter. They contend that Son instead met with Todd Heptinstall, Marketing and Admissions Director for Facility. According to the testimony of Mr. Heptinstall, Son, hours prior to his mother's admission, called him about taking care of Mother's admitting paperwork. Mr. Heptinstall stated that Son held himself out as Mother's oldest son. On the strength of that representation, Mr. Heptinstall asked Son to come to Facility and took him through the admission packet (which included the arbitration agreement) and had him sign the various documents. Mr. Heptinstall testified that Son informed him that he was "the executor of [Mother's] affairs"; he admitted, however, that he did not ask for any evidence of Son's authority to act on Mother's behalf. Mr. Heptinstall did claim that he was with Mother three times on the day of her admission and on each occasion, she was "comatose" and unable to interact and communicate.

Mr. Heptinstall testified that he did not explain any of the documents to Son because no questions were asked of him. He claimed that he did read the bolded portion of the arbitration agreement to Son. Interestingly, the examination of Mr. Heptinstall further revealed that his signatures on the documents were not likely made at the same time as those of Son, and that the dates adjacent to the signatures on many of the documents were likely added by a different person on a date after the documents were allegedly signed. Mr. Heptinstall acknowledged that no copies of the admission documents were given to Son or Mother.

Ms. Buck testified that she did not present Son with the admissions paperwork at issue or the arbitration agreement, but did talk with him about other paperwork, including a "Physician Order for Scope of Treatment ("POST")" form. On that form, although testifying that she had no recollection of Son, Ms. Buck described him as "son/POA." During her testimony, she related that "[t]he only reason I would have written son/POA is if he told me

-3-

he was the power of attorney. Otherwise, I would have just written son." She testified further as follows:

> Q. Now, in the absence of being presented with a power of attorney, you can't rely on it can you? You're told that that somebody holds themselves out as a POA, you have to get a copy of it to file, right?
>
> A. Right.
>
> Q. And you apparently authorized Mr. Blackmon's signature because he was her son, right?
>
> A. Right.
>
> Q. You didn't rely on his status as a POA, did you?
>
> A. Well, according to the document I was told he was the POA. But yes, I would have let him sign his mom's paperwork.
>
> Q. Because he was her son?
>
> A. Right.
>
> Q. Not because he was a POA?
>
> A. Right.

Ms. Buck admitted that she never discussed admissions issues with Mother. In a social services history, she acknowledged that she had observed Mother, who was alert and could tell person, place, and time, and could communicate her needs.

Son testified that he never met Mr. Heptinstall at any time. He was adamant that Mr. Heptinstall did not go through the admissions documents with him. Son notes that the only male employee he ever met at Facility was defendant Jon Bower, the administrator, during a meeting at Facility to discuss concerns about Mother's care.

According to Son, he never considered a 1991 durable power of attorney that his mother had executed sixteen years earlier in California, as the purposes for that document had long since been accomplished. Defendants, however, having discovered the existence of the power of attorney, argue that Son was Mother's duly authorized attorney-in-fact, even

though Facility, at the time of Mother's admission, was unaware of the existence of the power of attorney and the original of the document has never been located.

The arbitration agreement included in the admissions paperwork reads as follows:

RESIDENT AND FACILITY ARBITRATION AGREEMENT

\* \* \*

*PLEASE READ CAREFULLY*

. . . any legal dispute, controversy, demand or claim that arises out of or relates to the Resident Admission Agreement or any service or health care provided by the Facility to the Resident, shall be resolved exclusively by binding arbitration administered by National Arbitration Forum ("NAF") to be conducted at a location agreed upon by the parties, or in accordance with the Code of Procedure of NAF which is hereby incorporated into this agreement, and not by a lawsuit or resort to court process except to the extent that applicable state or federal law provides for judicial review of arbitration proceedings or the judicial enforcement of arbitration awards. In the event NAF is no longer administering arbitrations, the arbitration shall be administered by the American Arbitration Association pursuant to NAF Rules.

This agreement to arbitrate includes, but is not limited to, any claim for payment, nonpayment or refund for services rendered to the Resident by the Facility, violations of any right granted to a Resident by law or by the Resident Admission Agreement, breach of contract, fraud or misrepresentation, negligence, gross negligence, malpractice, or any other claim based on any departure from accepted standards of medical or health care or safety whether sounding in tort or in contract. This agreement to arbitrate shall not limit a Resident's right to file a grievance or complaint, formal or informal, with the Facility or any appropriate state or federal agency.

The parties agree that damages awarded, if any, in an arbitration conducted pursuant to this Arbitration Agreement shall be determined in accordance with the provisions of the state or federal law applicable to a comparable civil action, including any prerequisites to, credits against, or limitations on, such damages.

It is the intention of the parties to this Arbitration Agreement that it shall inure

to the benefit of and bind the parties, their successors and assigns, including the agents, employees and servants of the Facility, and all persons whose claim is derived through or on behalf of the Resident, including that of any parent, spouse, child, guardian, executor, administrator, legal representative, or heir of the Resident.

All claims based in whole or in part on the same incident, transaction, or related course of care or services provided by the Facility to the Resident, shall be arbitrated in one proceeding. A claim shall be waived and forever barred if it arose prior to the date upon which notice of arbitration is given to the Facility or received by the Resident, and is not presented in the arbitration proceeding.

THE PARTIES UNDERSTAND AND AGREE THAT BY ENTERING INTO THIS ARBITRATION AGREEMENT, THEY ARE WAIVING THEIR RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND JURY AND AGREE TO PROCEED WITH ANY CLAIM THROUGH ARBITRATION.

The Resident or Resident's Legal Representative understands that (1) they have the right to seek legal counsel concerning this agreement, (2) the execution of this Arbitration Agreement is not a precondition to the furnishing of services to the Resident by the Facility, and (3) this Arbitration Agreement may be rescinded by written notice to the Facility from the Resident or Resident's Legal Representative during the Resident's admission. If not rescinded within thirty (30) days after the Resident's admission, this Arbitration Agreement shall remain in effect for all care and services rendered at the Facility, even if such care and services are rendered following the Resident's discharge and readmission to the Facility.

If any provision of this Arbitration Agreement is determined to be unenforceable, such provision shall be deemed to be severed and deleted and any such severance or deletion shall not affect the validity and enforceability of the remaining provisions of this Arbitration Agreement.

This agreement shall be governed by and interpreted under the Federal Arbitration Act found at 9 U.S.C. Sections 1-16.

The admissions packet presented to the court as an exhibit is 39 pages long. The

arbitration agreement is printed in the same color ink, font size, and font type as the rest of the admissions paperwork. The arbitration procedures are included among the rest of the admissions documents dealing with many issues, including financial arrangements and consent to care. A review of the arbitration agreement reveals that it does not include a statement to the patient encouraging him or her to ask questions. It does not expressly state who is responsible for choosing the arbitrator and does not explain in any detail how arbitration works. There is no discussion of any fees associated with the process. Interestingly, the document requires as follows:

> [If a Resident's legal representative is signing, they (sic) must include documentation of authority such as Power of Attorney/Guardianship papers or have authority to act on the Resident's behalf][.]

Defendants contend that the general durable power of attorney executed by Mother on November 11, 1991, became effective immediately upon execution and authorized Son to sign the agreements on Mother's behalf. The power of attorney provided Mother's agents the power to "act in my place and my stead in any and all manners of transactions whatsoever, to exercise, do, or perform any act, right, power, duty, or obligation whatsoever that I now have or may acquire the legal right, power, or capacity to exercise, do or perform in connection with, arising out of, or relating to any person, item, thing, transaction, business, property, real or personal, tangible or intangible, or any matter whatsoever." The 1991 document provided that 1) "These powers will exist for an indefinite period of time," and 2) "You have the right to revoke or terminate this durable power of attorney at any time."

On January 13, 2010, the trial court held an evidentiary hearing on Defendants' Motion to Compel Arbitration. Two stipulations were entered: 1) Mother was presumed to be mentally competent on the day of her admission to the facility, April 10, 2008; and 2) Facility did not have a copy of the 1991 power of attorney in its possession at the time Son signed the Admissions paperwork at Facility. At the conclusion of the hearing, the court ruled from the bench as follows:

> [T]his Court -- first of all, this Court just thinks personally, not lawfully or not legally, that these types of contracts should be void as being against public policy of fairness and openness to everybody, or absent anything else on what we have seen on this contract, this type of contract should be, in my opinion, unconscionable.
>
> It is unconscionable in my opinion. But this same type of contract has been upheld by the Appellate Courts and therefore it is legally sufficient and the

Court so finds.[1]

The Court does not feel in this case that this was a contract of adhesion in that plaintiff insists that it was a take-it-or-leave it contract. It was never presented to him in that form. He just signed it.

And so for that reason, there was no proof that they said take it or leave it. He was not denied the opportunity to read it, even though it was not explained to him.

But the Court again finds there was nobody on either side that had sufficient knowledge or training or understanding to even explain it. And that is just bizarre to me.

In weighing or in deciding any case the Court must obviously where there is a conflict in testimony base its decision on the credibility of witnesses.

* * *

The thing that impresses me, just to be quite candid with you, above all is Ms. Buck. Because she, I think, testified very candidly and honestly about everything that she did, everything that she knew or didn't know.

As I say, she said that she doesn't recall the plaintiff discussing or her discussing with him a power of attorney. She didn't even remember the deceased, which is not critical in this case because she wasn't talking with the deceased, but she took the family history and background and medical history, et cetera.

Her testimony is consistent in the sense that apparently she told the plaintiff that these documents had to be signed for the purposes of admission and getting . . . Medicare.

Anyway, that is certainly consistent because she didn't understand the issues about arbitration. She didn't understand them. So I think she was very candid and very honest with the Court.

---

[1]In *Owens v. Nat'l Health Corp.*, 263 S.W.3d 876 (Tenn. 2007), the Tennessee Supreme Court rejected the argument that pre-dispute arbitration agreements in nursing home contracts are per se invalid as contrary to public policy.

-8-

\* \* \*

Ms. Buck relied upon the plaintiff's status as the deceased's son and not the power of attorney.

. . . [T]he plaintiff had no understanding of the provisions related to arbitration.

But the Court finds that accepting his testimony that he basically signed it without reading it, so his understanding of it at that point is sort of immaterial because he didn't rely upon any representations at the time he signed it.

Likewise, Mr. [Heptinstall] . . . said that he relied upon the plaintiff's statements that he was her executor and not power of attorney or -- he didn't rely upon any expressions of authority except what the plaintiff said.

As I stated earlier, if you're going to have to be able to answer questions about these contracts, you need to understand the terms.

If you are relying upon the legality of these agreements, then you should likewise be held to a standard of understanding the legality of the status of the parties.

An executor is what we in Tennessee hold is a person who handles an estate after someone is dead and therefore has no authority to act until that person dies. The Court is troubled that -- and as I say, the plaintiff has not proven fraud by clear and convincing evidence as the Tennessee law requires.

But it troubles this Court that anybody who requires someone to sign legal documents affecting the rights of patients, the medication of patients, the payment of the patient's bills, would not give those people copies, executed copies. That makes no sense to me. Makes no sense to me. It's not good practice.

I think the point that was raised about that the plaintiff is stuck with arbitration on all issues but that the defendant is not on all issues is a mutuality issue possibly. That's troubling to me.

It is troubling to this Court that documents were signed on behalf of the defendants some day or so, at least one day if not two days later after the plaintiff signed it and his mother had already entered into the health care

-9-

facility. So, there was no apparent authority of the plaintiff to act at the time of the execution of this agreement.

. . . [T]he defendants could not rely at that time upon any express authority either from Mrs. Pierce telling them or from the power of attorney that had been executed in California in 1991.

. . . [I]t is interesting that a will and other powers of attorneys were executed after Mrs. Pierce went into the health care facility.

And there is no Tennessee case law, but it makes sense to me that if a power of attorney has not been used for over a decade, that the term lapsed is very appropriate.

I mean, it is clear to me that neither Mrs. Pierce nor the plaintiff intended for this thing to -- the power of attorney to survive the purposes for which it was executed, i.e. the distribution of various estate properties.

Mr. Blackmon didn't think it was effective. The Court just feels like that under the totality of circumstances, that neither Mrs. Pierce nor Mr. Blackmon intended it to be effective and operative.

Therefore, the Court holds that it has lapsed. The Court further finds then that based upon the fact that it had lapsed, that the defense has not proven any other lawful basis for the plaintiff to have had the authority to execute this agreement.

So therefore, the Court finds that the defendants are not entitled to rely upon this agreement for the purposes of forcing this matter to arbitration.

Just in passing, again, just this entire scenario does shock the conscience of this Court. It is just so slipshod in its operation and its effect. It just doesn't speak well.

And this Court must find that as it relates to a meeting between the plaintiff and Mr. [Heptinstall], that -- and I hate to say this, but I am just satisfied that that meeting did not take place. And the Court gives great weight to Mr. Blackmon's testimony on that matter.

I think he has certainly carried it well. His testimony is much more believable

based on the timing and the signing and the dating of documents.

* * *

The agreement itself, the document itself, this Court finds is not unconscionable because our Appellate Courts have held that these agreements in and of themselves are not unconscionable.

* * *

The Court does find that as to the execution of this agreement, the way that it was handled, it was very shoddy.

And I think that quite candidly is unconscionable, that it does shock the conscience of this Court by how this entire arrangement was handled. . . .

MR. CONNOR: From my understanding, the Court finds that the circumstances surrounding the execution were unconscionable?

THE COURT: Are so unconscionable that they should not be enforced.

On May 28, 2010, the trial court issued the following written findings:

1. At the time of her admission to the nursing home, Lois Pierce was fully competent to make decisions for herself. The Defendants stipulated to her competency and the record is replete with evidence that Mrs. Pierce was alert, oriented, independent, and fully capable of making her own decisions at the time of her admission to Pigeon Forge[.]

2. Tennessee law accords nursing home residents certain minimum rights, T.C.A. § 68-11-901. At the time of Mrs. Pierce's admission to Pigeon Forge, those rights included, the right "[t]o exercise the resident's own independent judgment by executing any documents, including admission forms. . . ." T.C.A. § 68-11-901(23). The law further provided that a nursing home resident's rights could only be abridged when "medically contraindicated" or when necessary to protect other residents. Further, such abridgement must be supported by a physician's order and must be explained to the resident and documented in the resident's record by reciting the limitation's reason and scope. T.C.A. § 68-11-902.

3. Notwithstanding these rights (and the requirements of the statutory protocol which must be followed before they can be abridged), Lois Pierce was not afforded the opportunity to execute the admission agreement or the arbitration agreement (a subpart of the admission agreement) upon her admission to the nursing home.

4. Defendants maintain they were excused from any obligations under the statutes because her son, Dennis Blackmon, signed the admitting documents, including the arbitration agreement at issue, on the day of her admission to the nursing home. They also maintain that in accordance with that agreement, arbitration is the exclusive remedy for Plaintiff's complaints about Mrs. Pierce's care at the nursing home.

5. The evidence is in sharp dispute concerning the circumstances under which Dennis Blackmon signed the admission agreement which included the arbitration agreement relied on by the Defendants in their motions to compel arbitration.

6. Dennis Blackmon testified that upon his arrival at the nursing home on April 10, 2008, to first visit his mother, he was directed to the office of Social Services Director Donna Buck. Mr. Blackmon testified he was presented with a number of documents to be signed. Those documents apparently included the arbitration agreement which is the subject of this controversy. According to Mr. Blackmon, Mrs. Buck indicated where he was to sign the various documents and he did so without reading them, relying on Buck's representations that they were merely documents required for the facility to obtain payment from Medicare for Mrs. Pierce's care and services. Mr. Blackmon denied ever holding himself out as his mother's attorney-in-fact or his mother's legal representative to Mrs. Buck or anyone else at the facility. Mr. Blackmon testified that at the close of his meeting with Mrs. Buck, she directed him to his mother's room. He was not provided with copies of any of the documents he had signed.

7. Mrs. Buck acknowledged in her testimony that she met with Mr. Blackmon in her office at the facility, but stated that she had no independent recollection of what transpired in the meeting and would have to defer to Mr. Blackmon's recall of the meeting. She acknowledged having Mr. Blackmon sign some documents for his mother, indicating that the only basis she relied on for his authority to do so was the fact that "he was her son." Mr. Blackmon did not present a power of attorney to her.

8.  Mrs. Buck further acknowledged that Mrs. Pierce had the right to sign the forms that she presented to Mr. Blackmon, but she did not afford Mrs. Pierce -- whom she found to be alert, oriented and capable of making her own decisions -- the opportunity to do so.  Mrs. Buck also candidly admitted that she (Buck), did not understand the arbitration agreement and did not feel competent to explain it to any one.

9.  In contrast to Mr. Blackmon's testimony, Todd Heptinstall, Marketing and Admissions Director for Pigeon Forge, testified that he met with Mr. Blackmon on the day of Mrs. Pierce's admission, before her arrival at the facility, and reviewed the admissions packet (approximately 60 pages including the arbitration agreement), with him, explaining the terms of the various documents.  He then, ostensibly, secured Mr. Blackmon's signature on the relevant documents.

10.  Mr. Heptinstall further testified that Blackmon told him that he "was the executor in charge of her affairs" and Mrs. Pierce's "oldest" son.[2]  Those alleged representations purportedly were the basis for the authority relied on by Heptinstall to have Mr. Blackmon sign the documents.

11.  Heptinstall acknowledged that he never afforded Mrs. Pierce the right to execute the admission forms herself.  He stated that on the three occasions that he saw Mrs. Pierce on the day of admission -- at the hospital, on arrival at the nursing home, and in her room some two hours later -- she was "comatose," a fact contradicted by the testimony of the other witnesses and the portions of the nursing home chart admitted into evidence.

12.  The Court has carefully weighed the credibility of the witnesses and rejects the testimony of Mr. Heptinstall.  Upon consideration of all the evidence, the court finds that the meeting attested to by Mr. Heptinstall did not take place.  The Court gives great weight to Mr. Blackmon's testimony and finds his testimony about his meeting with Mrs. Buck is more believable than the testimony of Mr. Heptinstall.

13.  Mrs. Buck appears to the Court to have testified candidly and honestly about the things she knew and did not know.  The Court finds that she met with Mr. Blackmon and told him that the documents in issue had to be signed for the purposes of Mrs. Pierce's admission in order for the nursing home to

---

[2]Mr. Blackmon is actually Mother's middle son.

secure payment from Medicare. However, it is also clear that Mrs. Buck did not understand the agreement to arbitrate and wasn't able to explain it.

14. In procuring Mr. Blackmon's signature on the agreement to arbitrate, Mrs. Buck relied solely upon his status as the deceased's son and not on any power of attorney or any representation by him concerning his status as Mrs. Pierce's attorney-in-fact or legal representative. The Court finds no fraud on the part of Mrs. Buck in inducing Mr. Blackmon to sign the documents. Although Mrs. Buck had Mr. Blackmon sign the documents, Mrs. Pierce was competent to make her own decisions and to sign the documents, including the arbitration agreement, for herself. Nevertheless, she was never afforded that opportunity by anyone from the nursing home.

15. Tennessee law is clear that relatives do not have inherent authority to bind their elderly loved ones to agreements and to act in their place and stead in making decisions when they are otherwise competent to make decisions for themselves. As the Court explained in *Cabany v. Mayfield Rehabilitation and Special Care Center*, 2007 WL 34445550, *5 (Tenn. Ct. App. 2007): "Personal autonomy -- an adult's right to live independently and in accordance with his or her own personal values -- is a fundamental right (citation omitted). The right is of sufficient importance that the law presumes that adults have the capacity to be autonomous." In this case, Defendants admit that Mrs. Pierce had the requisite capacity to make her own decisions and her capacity for autonomy is amply supported by the record.

16. In order for Mr. Blackmon to have bound his mother to the arbitration agreement, he would have to have been acting as her actual or apparent agent when he signed the document. *See e.g. Thornton v. Allenbrooke Nursing and Rehabilitation Center*, 2008 WL 2687697 (Tenn. Ct. App.) An arbitration agreement signed by a family member, even next of kin, without apparent or express authority of the nursing home resident is invalid. *Raiteri v. NHC Healthcare/Knoxville*, 2003 WL 230944413 (Tenn. Ct. App.)

17. The court finds on the evidence presented in this case that Mr. Blackmon was not acting as his mother's apparent or actual agent at the time he signed the arbitration agreement and further finds there was no reliance by any of the Defendants on Mr. Blackmon's alleged status as Mrs. Pierce's agent or attorney-in-fact. The court further finds that the only basis on which Mrs. Buck relied for Mr. Blackmon's authority to sign the agreement at issue for his mother was the fact that "he was her son." Being next of kin is not enough to

establish Mr. Blackmon's apparent authority to sign on his mother's behalf.

18.  Defendants also maintain that Mr. Blackmon had actual authority to act on his mother's behalf in signing the arbitration agreement by virtue of a Durable Power of Attorney executed by Lois Pierce in 1991 while living in California.  However, that document was never presented to anyone at the nursing home during Mrs. Pierce's residency nor relied on by any of the Defendants for Mr. Blackmon's authority to act when signing the arbitration agreement.

19.  A copy of the power of attorney now relied on by the Defendants was first produced in discovery by Plaintiff in response to the request of the Nursing Home Defendants.  Mr. Blackmon was unable to locate the original of the document among his mother's personal effects despite his efforts to do so. The document did not specify the length of time of its existence and by its terms existed for an "indefinite period of time."

20.  Where no time is specified in a power of attorney, the authority terminates at the end of a reasonable period.  Restatement (Second) 1 *Agency* s 105; 3 Am Jur. 2d, *Agency*, s 35.  What constitutes a reasonable time during which the authority continues is determined by the nature of the act specifically authorized, the formality of the authorization, the likelihood of changes in the purposes of the principal, and other factors.  Restatement (Second) 1 *Agency* s 105, comment b.  Whether the agency has expired by lapse of time is a question for the trier of fact to determine.

21.  Upon consideration of the evidence, this Court finds that the California power of attorney Defendants now seek to rely on had lapsed prior to the time Mr. Blackmon signed the arbitration agreement.  The purposes for which that document had been created (distribution of Mrs. Pierce's dead husband's estate by her sons in the event she was unable to accomplish that herself) had, in fact, been accomplished by Mrs. Pierce in 1994.  No action had ever been taken by Dennis Blackmon pursuant to that document since its creation and Mr. Blackmon did not act pursuant to that power of attorney when he signed the arbitration agreement.  Neither Mrs. Pierce nor Mr. Blackmon was under the impression that the sixteen year old document was in effect at the time of her admission to the nursing home.  Indeed, just five days after her admission to Pigeon Forge, Mrs. Pierce executed a Medical Power of Attorney and a General Power of Attorney.  The original of the California Power of Attorney document was not to be found among Mrs. Pierce's papers and personal

effects and whether the document was even in existence at the time of the hearing was not established.

22. The Court further finds that Mrs. Pierce took no actions at the nursing home creating any apparent authority in Dennis Blackmon to act on her behalf which was relied on by any Defendant at the time Mr. Blackmon signed the arbitration agreement.

23. In addition to the foregoing, the Court finds that the circumstances surrounding Mr. Blackmon's execution of the arbitration agreement were unconscionable. Mrs. Buck had no understanding of, or ability to explain, the document. Furthermore, the explanation of the documents she offered to Mr. Blackmon was incorrect.

24. Also, the time of the application of Mr. Heptinstall's signature to the document and the accuracy of the date inserted by his name is very much in doubt. The Court finds that Heptinstall did not sign the document at the time Mr. Blackmon signed it. Mr. Heptinstall's testimony created serious doubts about when, whether and under what circumstances he signed various of the documents which were part of the admissions packet. By his own testimony, his secretary signed his name to at least one of the documents and applied a date stamp to others of them. When signatures purporting to be those of Heptinstall were actually added to the various documents, including the arbitration agreement, is unclear, but the signatures purporting to be his were not applied when Mr. Blackmon applied his own thereto. The goal of the nursing home was clearly to "sell" the arbitration agreement to residents and their families, and by virtue of the testimony, the Court questions "at what price" the sale was consummated.

It is, therefore, ORDERED AND ADJUDGED that the motions to compel arbitration and to stay proceedings filed by the Nursing Home Defendants and Defendant Shook[3] be, and the same are hereby, denied.

In its ruling, the trial court concluded that the actual arbitration agreement itself was not substantively or procedurally unconscionable, was not a contract of adhesion, and that Son did not rely upon any representations from Ms. Buck when he signed the document without choosing to read it. The trial court did find, however, that the 1991 power of

---

[3]Defendant Shook has been dismissed from the action.

attorney had "lapsed" after a period of ten years and that Son therefore lacked authority on April 10, 2008, to sign the arbitration agreement on Mother's behalf. The trial court also found the circumstances surrounding the execution of the agreement to be unconscionable. From that order this timely appeal ensued.


## II. ISSUES

The issues presented to us in this appeal are restated as follows:

1. Did the trial court err in finding that Son lacked the express authority to sign the arbitration agreement as Mother's attorney-in-fact in connection with her admission to Facility?

2. Did the trial court err in finding the circumstances surrounding the execution of the arbitration agreement unconscionable?

3. Did the trial court violate the Federal Arbitration Act, which forbids state courts from discriminating against arbitration agreements by imposing additional requirements not generally imposed by Tennessee upon all contracts?


## III. STANDARD OF REVIEW

On appeal, this court reviews a grant or denial of a motion to compel arbitration under the same standards that apply to bench trials. *Cabany v. Mayfield Rehab. & Special Care Ctr.*, No. M2006-00594-COA-R3-CV, 2007 WL 3445550, at *3 (Tenn. Ct. App. Nov. 15, 2007). A trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). We accord great deference to a trial court's determinations on matters of witness credibility and will not re-evaluate such determinations absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). We review a trial court's conclusions of law under a de novo standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

The interpretation of a written instrument, including a power of attorney or an

arbitration agreement, is a matter of law. *Tenn. Farmers Life Reassurance Co. v. Rose*, 239 S.W.3d 743, 750 (Tenn. 2007) (power of attorney); *Fontaine v. Weekley Homes, L.P.*, No. M2002-01651-COA-R3-CV, 2003 WL 21946721, at *1 (Tenn. Ct. App. Aug. 13, 2003) (arbitration agreement). Thus, no presumption of correctness attaches to the trial court's interpretation of the written terms of the documents in question. However, the trial court is entitled to a presumption of correctness as to its findings with respect to the surrounding factual circumstances.

## IV. DISCUSSION

## MOTHER'S COMPETENCE

Son contends that he was not Mother's attorney-in-fact at the time of her admission to Facility, had no authority to waive her constitutional rights, and did not seek to do so by merely signing a stack of documents presented to him by Defendants and which were represented by Defendants as required merely to ensure Facility was paid by Medicare for services rendered to Mother. Son argues that Mother had the right to make her own decisions when she was admitted. Therefore, Son asserts that no valid agreement to arbitrate exists.

Tennessee law specifically provides that nursing home residents have the right to exercise their "own independent judgment by executing any documents, including admission forms." Tenn. Code Ann. § 68-11-901 (23) *(2006); Tenn. Comp. R. & Regs. 1200-8-6-.12(1)(t). Pursuant to Tennessee Code Annotated section 68-11-902, Mother's rights could not lawfully be abridged unless medically contraindicated and supported by either a physician's order or necessary to protect the rights and safety of other residents. Furthermore, Defendants were required to explain to Mother the reduction in her rights and document in her resident's record by reciting the limitations's reason and scope. *Id.*

The following records surrounding the beginning of Mother's stay at Facility attest to the fact that not only was she alert, oriented, and fully capable of making her own decisions, but also that Defendants were well aware of her status:

* 04/10/08 Social Services Progress Note: "alert and oriented x3, verbalizes needs"

* 04/14/08 Resident Assessment Protocols for Psychosocial Well-Being, Mood State notes "this res. is alert, oriented x3 and verbalizes needs."

* 04/18/08 Minimum Data Set (Assesses resident status since her admission

-18-

date)

> ** Section AB9 -- no history of mental retardation, mental illness, or developmental disability

* 04/24/08 Minimum Data Set (Assesses resident status for 7 preceding days)
   ** Sections B2-B3 relate no memory problems
   ** Section 4 Cognitive Skills for Daily Decision-Making: "INDEPENDENT-- decisions consistent/reasonable
   ** Section 5 Indicators of Delirium-Periodic Disordered Thinking/Awareness: "Behavior not present."
   * * Section 6 confirms her cognitive status, skills, and abilities had not changed since last assessment.

These records were reviewed during the testimony of Ms. Buck. While Ms. Buck had no recollection of Mother at all, she readily acknowledged that, according to the records, Mother was capable of making her own decisions.

The trial court found that Defendants were legally required to presume Mother's capacity unless proven otherwise. *See* Tenn. Code Ann. § 68-11-1812(b). As noted in *Cabany*, 2007 WL 3445550,

> "Personal autonomy -- an adult's right to live independently and in accordance with his or her own personal values -- is a fundamental right. *In re Conservatorship of Groves*, 109 S.W.3d 317, 327-28 (Tenn. Ct. App. 2003). The right is of sufficient importance that the law presumes that adults have the capacity to be autonomous. *Id.* at 329-30. Tennessee's General Assembly has explicitly stated that "[a]n individual is presumed to have capacity to make a health care decision, to give or revoke an advance directive, and to designate or disqualify a surrogate." Tenn. Code Ann. § 68-11-1812(b) (2006)."

*Id*. at *5.

A review of the record clearly reveals that Defendants never afforded Mother an opportunity to review, discuss, or sign any paperwork relating to her admission to Facility. Most significant to this case, they never gave her a chance to read and consider the arbitration agreement.

The right of access to the courts and to receive a trial by jury is an individual right and cannot be waived by a third party without proper authorization from the individual. Parties

-19-

simply cannot be required to arbitrate claims they did not agree to arbitrate. Before compelling arbitration, the trial court must first determine whether the nursing home and a resident entered into a valid agreement to arbitrate at all. A party moving to compel arbitration must show both the existence of a valid agreement to arbitrate and a dispute that falls within the scope of such agreement. *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003).

In *Hendrix v. Life Care Ctrs. of Am., Inc.*, No. E2006-02288-COA-R3-CV, 2007 WL 4523876, at *5 (Tenn. Ct. App. Dec. 21, 2007), we held that the durable power of attorney was not effective at the time of the resident's admission because the resident was still able to make her own medical decisions at the time of the admission. Thus, the daughter's waiver of her mother's right to a jury trial was unenforceable. *See also Thornton v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2007-00950-COA-R3-CV, 2008 WL 2687697 (Tenn. Ct. App. July 3, 2008).

An arbitration agreement signed by a family member, even a next of kin, without the express or apparent authority of the nursing home resident, is invalid. *Raiteri v. NHC Healthcare/Knoxville, Inc.*, No. E2003-00068-COA-R9-CV, 2003 WL 23094413 (Tenn. Ct. App. Dec. 30, 2003). In *Raiteri*, a husband met with a nursing home's admissions coordinator to sign admission papers, including an agreement to arbitrate any claims regarding his wife's care against the facility. *Id.* at *2. While he signed the agreements as his wife's "legal representative," he did not represent that he had any authority to enter into agreements on his wife's behalf. *Id.* The court found the husband did not have authority to waive his wife's right to a jury trial. *Id.* at *8. Pursuant to *Raiteri*, even if Defendants believed Son to be signing as Mother's son, that is not enough to divest her of her right to make decisions for herself. *See also Cabany*, 2007 WL 34455550, at *6.

By the time of the hearing, Defendants stipulated to the fact that Mother was competent to make her own decisions. We find that the trial court properly determined that Defendants never had a valid agreement to arbitrate with Mother because they did not allow her the opportunity to complete her own paperwork.

Defendants seek to excuse their failure to allow Mother to exercise her rights by arguing that Son was the duly authorized power of attorney, even though 1) Facility was unaware of the 1991 power of attorney and 2) the original of the document has never been located.

## 1991 POWER OF ATTORNEY

A power of attorney is a written instrument that creates a principal-agent relationship. In *Tenn. Farmers Life Reassurance Co. v. Rose*, 239 S.W.3d 743 (Tenn. 2007), the Tennessee Supreme Court observed that a formal written instrument "like a power of attorney should be subjected to careful scrutiny in order to carry out the intent of the author and no more. There should be neither a "strict" nor a "liberal" interpretation of the instrument, but rather a fair construction that carries out the author's intent . . . ." *Id.* at 750. The terms of the 1991 power of attorney provided as follows::

> I, Lois L. Pierce, on the date hereafter set forth do hereby appoint Dennis W. Blackmon and Ricky E. Blackmon, joint and severally, my attorney-in-fact with the power to act in my place and my stead in any and all manners of transactions whatsoever, to exercise, do, or perform any act, right, power, duty, or obligation whatsoever that I now have and may acquire the legal right, power, or capacity to exercise, do, or perform in connection with, arising out of, or relating to any person, item, thing, transaction, business, property, real or personal, tangible or intangible, or any matter whatsoever.

> This Power of Attorney shall not be affected by the subsequent incapacity of the principal. These powers will exist for an indefinite period of time. . . .

> This instrument is to be construed as a general power of attorney and shall not limit or restrict the general powers granted to my attorney in fact.

From the evidence of record, it appears Mother's 1991 power of attorney existed to allow Son and/or his brother to distribute the property of a deceased stepfather to the stepfather's three children in the event Mother became incapacitated or incompetent.[4] As a distribution of the property to Mother's stepchildren was conducted in 1994, Son indicated that it was his belief the purpose for the power of attorney had ceased. Thus, Son did not consider himself to be Mother's attorney-in-fact at the time of her admission to Facility and did not represent himself as serving in that capacity.

As noted in *Barbee v. Kindred Healthcare Operating, Inc.*, No. W2007-00517-COA-R3-CV, 2008 WL 4615858 (Tenn. Ct. App. Oct. 20, 2008),

---

[4]The trial court made findings regarding Mother's intention and the circumstances surrounding the execution of the document.

The common law of agency "attributes the legal consequences of one person's action to another person." Restatement (Third) of Agency ch. 2, Introductory Note (2006). The Restatement notes that "[r]elationships of agency are among the larger family of relationships in which one person acts to further the interests of another and is subject to fiduciary obligations." *Id.* § 1.01, cmt. g. Unlike some other fiduciary relationships, in an agency, the principal has the power to terminate the authority of the agent. *Id.* A common-law agency arises when the principal assents for the agent to act on the principal's behalf, and the agent agrees. *Id.* § 1.01, cmt. c. A person who is not in a mental condition to contract is not competent to appoint an agent for the purpose of contracting. 3 Am.Jur.2d *Agency* §11 (2002). An agency relationship is created only "at the will and by the act of the principal and its existence is a fact to be proved by tracing it to some act of the alleged principal and turns on facts concerning the understanding between the alleged principal and agent." *Id.* § 15.

Two bases under which the common law attributes the legal consequences of the agent's actions to the principal are actual authority and apparent authority. Restatement (Third) of Agency ch. 2, Introductory Note (2006). The Restatement includes implied authority under the auspices of actual authority. The term "implied authority" is typically used to denote actual authority either to do what is necessary to accomplish the agent's express responsibilities, or to act in a manner that the agent reasonably believes the principal wishes the agent to act, in light of the principal's objectives and manifestations. *Id.* § 2.01 cmt. b.

*Id.* at *6. The *Barbee* opinion goes on to note that apparent authority

is the power held by the putative agent "to affect a principal's legal relations with third parties when a third party reasonably believes the [putative agent] has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* § 2.03. In Tennessee, apparent authority has been described as:

> (1) such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing;
> (2) such authority as he appears to have by reason of the actual authority which he has;
> (3) such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would

-22-

naturally suppose the agent to possess.

> *Franklin Distrib. Co. v. Crush Intern. (U.S.A.), Inc.*, 726 S.W.2d 926, 930-31
> (Tenn. Ct. App. 1986).  We note that "a principal is responsible for the acts of
> an agent within his apparent authority only where the principal himself by his
> acts or conduct has clothed the agent with the appearance of authority, and not
> where the agent's own conduct has created the apparent authority."  *S. Ry. Co.*,
> 197 S.W.at 677.  The burden is on the claimant to show the authority of the
> agent.  *John J. Heirigs Const. Co. v. Exide*, 709 S.W.2d 604, 608 (Tenn. Ct.
> App. 1986).

2008 WL 4615858, at *6-7.


## POWER OF ATTORNEY LAPSED

Although the 1991 power of attorney provides that the powers granted "will exist for an indefinite period of time," where no date of termination is given, an agency is terminated "after the expiration of a reasonable time."  3 Am. Jur.2d *Agency* § 35; *Rutter v. Rutter*, 398 P.2d 259, 261 (N.M. 1964); *Beaucar v. Bristol Fed. Sav. & Loan Ass'n*, 268 A.2d 679, 687 (Conn. Cir. Ct. 1969).  Further, the issue of expiration of an agency relationship by lapse of time must be resolved by the trier of fact.  *Beaucar*, 268 A.2d at 687; *Losada v. Senese Mfg. Co.*, 94 A.2d 616, 618 (Conn. Cir. Ct. 1953).

> In *Rutter*, the Supreme Court of New Mexico quoted 3 Am.Jur.2d *Agency* § 35:

> If no time is specified for the termination of the agency, it is generally held that
> the contract and authority thereunder may be cancelled and revoked after the
> expiration of a reasonable time.  If the contract is indefinite, the determination
> of what constitutes a reasonable time will depend upon the facts and
> circumstances of the particular case . . . .

398 P.2d at 742.  The Court went on to note "[w]hat constitutes a reasonable time under the conditions prevailing here, was a matter within the province of the trial court to determine." *Id*.

Son did not believe the 1991 power of attorney was still in effect when Mother entered Facility.  The original of the power of attorney has never been located, and there is no evidence that it was even in existence at the time of Mother's admission to Facility.  The original was never in Son's possession.  Despite a diligent search, it was not found among

Mother's personal effects or located anywhere else. The evidence at the hearing established that the original of the power of attorney had been returned to Mother by her attorney after it was recorded in the California court. In fact, believing a valid power of attorney did not exist for legal or healthcare decisions, Mother executed a General Power of Attorney and a Medical Power of Attorney on April 15, 2008, five days after her admission to Facility. Son testified that earlier that same year, his brother Charles had suggested to Mother that she prepare a Will and power of attorney. Accordingly, the trial court properly found from the facts and circumstances that the 1991 power of attorney had lapsed where Son never exercised any powers under it and the purposes for its creation had been accomplished many years prior to Mother's admission to Facility.

## ACTIONS OF MOTHER

As to her admission to Facility, Mother took no actions to clothe Son with authority to act as her agent. No evidence whatsoever exists in the record before us pointing to any action taken by Mother, the principal, that cloaked Son with either express or apparent authority to act on her behalf in executing the admission documents, including the arbitration agreement.

"A principal is bound neither by contracts made by a person not his agent, nor by those of his agent beyond the scope of his actual and apparent authority, which he has not ratified and is not estopped to deny." *Hearn v. Quince Nursing & Rehab. Ctr., LLC*, W2007-02563-COA-R3-CV, 2008 WL 4614265 (Tenn. Ct. App. Oct. 16, 2008) (holding that estate of a resident could not be bound to arbitration agreement signed by the resident's adult child absent some act and/or conduct of the resident creating authority); *Thornton v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2007-00950-COA-R3-CV, 2008 WL 2687697 at *8 (Tenn. Ct. App. July 3, 2008) (holding that even where daughter was highly involved in personal matters of competent resident, no action was taken by resident indicating to the facility that daughter was her agent).

## ACTUAL OR APPARENT AUTHORITY OF SON

Son contends that he had neither actual nor apparent authority to act as Mother's power of attorney at the time of her admission. Son notes that at no time did he hold himself out as Mother's attorney-in-fact, and he never indicated that he held a power of attorney authorizing him to act on her behalf. Facility never asked for or received a power of attorney in connection with Mother's admission.

A review of the documents Son signed at the time supports his contention that he lacked authority. For example, the admission agreement contains four signature blanks: 1) for "Resident/Legal Guardian"; 2) for "Power of Attorney"; 3) for "Responsible Party"' and 4) for "Witness." The only blank signed by Son is the one designated for a responsible party. Clearly he did not view himself as having a power of attorney or he would have signed in that space. Where other documents in the package bear his signature above the line for "responsible party" or "POA," in those instances, he had no other choices as to the location of his signature on the documents.

Further, part of the admission agreement states, "The above individual signing on behalf of the beneficiary certified that it is impractical for the beneficiary to sign this customer checklist due to:" and is followed by blanks to indicate the type of disability requiring signature of one other than the beneficiary -- "Physical Incapacity," "Mental Incapacity," "Death," and "Other." None of these blanks is checked. Many of the other documents in the package are also incomplete when the document calls for a description of Son's legal relationship to Mother.

During the sixteen years between the execution of the 1991 power of attorney and Mother's admission to Facility, Son never exercised any power pursuant to the power of attorney document. The record is clear that during that time frame, Son did not handle any of Mother's personal or financial affairs. Mother remained independent in all of her decision-making.

## KNOWLEDGE OF DEFENDANTS

Until discovery in this lawsuit, Defendants were unaware of the 1991 power of attorney which identified Son and his brother, Rickey E. Blackmon, jointly and severally, as Mother's attorneys-in-fact. Defendants stipulated at the onset of the hearing that Facility was completely unaware of the existence of this document until it was produced during discovery. Therefore, reliance on the document is misplaced because Defendants never relied on Son's alleged standing as attorney-in-fact. The evidence of record supports the conclusion that Defendants sought Son's signature on the admission documents solely because he was Mother's son – not on the basis that he held any power of attorney for her.

There is no dispute that Defendants took no steps to confirm any purported or suspected authority of Son to act as Mother's agent. The agreement to arbitrate itself requires that *"If a Resident's legal representative is signing, they must include documentation of authority such as Power of Attorney/Guardianship papers or have authority to act on the Resident's behalf."* (Emphasis added). Defendants have admitted

that they did not obtain from Son any documentation pertaining to him holding a power of attorney for Mother at the time her admission.  This omission by Facility is also revealed by Facility's own "Financial Record Checklist" which checks all items contained in Facility's file.  This document notes that "items not checked are missing."  The blank adjacent to the item "Power of Attorney" is not checked.

The only evidence in the record before us from which Defendants could argue that they believed Son held a power of attorney at the time of Mother's admission is the testimony of Mr. Heptinstall.  This evidence, however, was dismissed outright by the trial court which found the testimony "not credible" and further concluded that Mr. Heptinstall had never even met with Mr. Blackmon.  Moreover, even if Son had made a representation that he was authorized to act on Mother's behalf, Defendants were not entitled to rely on this representation alone to abrogate Mother's rights.  *See Hendrix v. Life Care Ctrs. of Am., Inc.*, No. E2006-02288-COA-R3-CV, 2007 WL 4523876 (Tenn. Ct. App. Dec. 21, 2007):

> "Nursing Home is not entitled, as it suggested on oral argument, to simply 'rely upon someone who comes in and says, I'm the POA. I have the authority. Here's the Power of Attorney.  Let me sign the documents.'  By signing the arbitration agreement, Daughter sought to bind Mother to a course of action that altered her legal rights.  Unless Mother's power of attorney documents were in effect at the time -- and we have already affirmed the trial court's ruling that they were not -- Daughter did not have power to do this.  That her retrospective powerlessness now accrues to her own benefit is an odd quirk of the case's facts, and is undoubtedly frustrating to Nursing Home, but it does not alter the pertinent legal doctrines nor the proper outcome of this case."

*Hendrix*, 2007 WL 4523876, at *7.

The power of attorney had lapsed and Defendants cannot establish that they reasonably relied on it even if it has not become ineffective.  Son did not have the power to bind Mother to a course of action that altered her legal rights.  The arbitration agreement was not validly agreed to by Mother, who was competent to act on her own behalf.  Thus, Mother's estate cannot be legally bound by the arbitration agreement signed by Son.

In view of our holding, we do not find it necessary to address the other arguments raised by Defendants regarding the arbitration agreement.  Those issues are therefore pretermitted.

## V. CONCLUSION

The order of the trial court denying Defendants's motion to compel arbitration is affirmed. Costs on appeal are taxed to the appellants, LP Pigeon Forge, LLC; Signature Consulting Services, LLC; Signature Clinical Consulting Services, LLC; Signature Healthcare, LLC; Jonathan Jack Bowers; Integritas Health Care, LLC; Integritas LTC Practitioners of Tennessee, LLC; Integritas Professional Development Services, LLC; Integritas of Tennessee, LLC; and Kathleen A. Arnold. This case is remanded for further proceedings consistent with this opinion.

_____
JOHN W. McCLARTY, JUDGE